UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-60050-Altman

UNITED STATES OF AMERICA,
                    Plaintiff,

v.

MELANIE HARRIS,
                    Defendant.
_____/

**OBJECTIONS TO THE DRAFT PRESENTENCE INVESTIGATION REPORT
AND REQUEST FOR DOWNWARD DEPARTURE OR VARIANCE**

The Defendant, Melanie Harris, through undersigned counsel, respectfully files the following objections to the draft Presentence Investigation Report (PSI) (DE 89), and, per the Court's Order Setting Date, Time, and Procedures for the Sentencing Hearing (DE 84) moves for a downward departure or, in the alternative, a downward variance from the advisory sentencing guidelines.

**I.    PSI Objections and Corrections**

**A.  The Offense Conduct Section**

Paragraph 7 of the draft PSI states, "Not knowing who or where she was or what she looked like, the victims were left to wonder whether she might be watching them at any moment, greatly accentuating the threatening nature of her conduct." Paragraph 8 contains information and details about the shooting at the Tree of Life synagogue and a subsequent Vanity Fair article about that shooting written by one of the victims in this case.

Based on the discovery provided to the defense, including interview summaries

with the victims and emails between the victims and law enforcement, the sentiment at the end of paragraph 7 is a conclusory opinion and not based on any actual statement by the victims. And even if it was, it should be moved to the Victim Impact section of the PSI.

The Tree of Life synagogue shooting was without question a horrific, violent crime. The perpetrator of that crime was convicted after a two-month trial and a jury unanimously recommended that he be sentenced to death. Paragraph 8 of the draft PSI, however, has nothing to do with Ms. Harris's offense conduct in this case. Ms. Harris had no involvement with that shooting. Indeed, paragraph 6 of the draft PSI states that there is "no information" indicating that Ms. Harris had any connection to the three victims in this case or the Tree of Life synagogue prior to her offense conduct. Paragraph 8 also implies that Ms. Harris read J.K.'s Vanity Fair article. That is an assumption; there is no evidence that Ms. Harris read that article. The entirety of paragraph 8 should be removed from the Offense Conduct section of the draft PSI.

Paragraph 15 of the draft PSI incorrectly characterizes Ms. Harris's calls to the FBI. Ms. Harris was not complaining about her biological father, Philip Taylor. She called the FBI over three dozen times to report that Mr. Taylor, who abandoned her as a baby and who she hasn't had contact with since, had been kidnapped by the KGB and was being held in Los Angeles. She was seeking the FBI's help in rescuing him from his alleged captors. In those calls and in a letter to the FBI, provided by the Government in discovery, she also claimed that her father was from the UK and was

a diplomat.

### B. Personal and Family Data

Paragraph 39 mistakenly lists James Lowe, Sr. as Ms. Harris's biological father. Philip Taylor is Ms. Harris's biological father. As mentioned above, she has no relationship with him. Mr. Lowe was her stepfather and he passed away when Ms. Harris was a child. They were very close during the time he was alive.

Paragraph 40 lists James Lowe, Jr. and Pamela Lowe as Ms. Harris's brother and sister. They are actually half siblings. Their father is James Lowe, Sr.

Ms. Harris, her mother, and her half siblings moved around frequently. Paragraph 42 contains a few errors about Ms. Harris's various residences. From birth until she was about 1 years old, Ms. Harris lived in Louisville, Kentucky. About a year after she was born, Ms. Harris and her mother moved to Phoenix, Arizona. That is where Ms. Harris's mother met James Lowe. After Mr. Lowe passed away in 1976, the family moved to Riverside, California. Shortly after Ms. Harris stopped attending college, she moved from Riverside back to Phoenix. She remained there until moving back to Riverside in 1996. Since then, she has remained in Riverside, California with her mother.

### C. Physical Condition

Paragraph 47 states that Ms. Harris's migraine headaches ceased in 2017 following a transient ischemic attack. Recently, however, her migraines have returned. She has reported these headaches to staff at FDC Miami and she has begun taking Ibuprofen to help with the symptoms.

3

## II.   Request for Downward Departure or Variance

Ms. Harris is requesting that the Court impose a sentence of 12 months in this case—the equivalent of a one-level downward departure. Ms. Harris acknowledges that the offense in this case was very serious and that she inflicted significant emotional pain on the victims. She is in no way minimizing her criminal conduct. But a full consideration of the § 3553(a) factors, as well as the specific grounds for departure identified by the U.S. Sentencing Commission, supports the imposition of a sentence slightly below the guideline range of 15-21 months in this case. At sentencing, Ms. Harris, through counsel and the testimony of Dr. Ted B. Cunliffe, a clinical and forensic psychologist, will provide further information and evidence in support of the requested sentence of 12 months. The paragraphs below highlight specific factors for the Court's consideration.

### A.  History and Characteristics of Ms. Harris

#### 1.  Ms. Harris's Physical Health

Ms. Harris is a 59-year old woman with a long history of debilitating migraine headaches that began in her early 20's and worsened into middle age. (PSI ¶ 46.) Starting in 1998, her migraines were almost daily and required her to seek medical attention at the ER approximately every six months. (*Id.*) Her headaches were serious enough that from 2000 until her arrest in this case, she received disability benefits from the Social Security Administration. (PSI ¶ 61.)

In 2017, Ms. Harris had a transient ischemic attack. A TIA is a brief stroke-like episode. Ms. Harris was hospitalized for two weeks as a result of that attack.

### 2. Ms. Harris's Role as Her Mother's Primary Caretaker

Ms. Harris has served as her mother's primary caretaker for the last ten years. (Competency Eval. Report at 6.) Ms. Lowe, her mother, age 80, suffers from mitrovalve prolapse, dementia, and Stevens-Johnson Syndrome (SJS), a rare, serious disorder of the skin and mucuous membranes that causes flu-like symptoms and painful rashes and blisters. (*Id.*) Ms. Harris drives her mother to medical appointments and maintains the household. (*Id.*) Ms. Harris has been in custody for over nine months. In that time, her long-time domestic partner has taken over caring for Ms. Lowe. A sentence of twelve months, along with some period of supervised release, would reflect the seriousness of Ms. Harris's conduct, while also ensuring that Ms. Lowe is able to spend her remaining years with her daughter.

### B. The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court consider the need to avoid unwarranted sentencing disparities when determining an appropriate sentence. Undersigned counsel consulted the U.S. Sentencing Commission's Judiciary Sentencing Information tool (JSIN) to determine the length of imprisonment imposed on defendants convicted of offenses that utilize the same guideline, 2A6.1, as Ms. Harris. JSIN is an online sentencing data tool that "provides cumulative data, based on five years of sentencing data for offenders sentenced under the same primary guideline, and with the same Final Offense Level and Criminal History Category selected."[1]

---

[1] United States Sentencing Commission, Judiciary Sentencing Information, available at: https://www.ussc.gov/guidelines/judiciary-sentencing-information.

According to JSIN, fifteen defendants were sentenced who were similarly situated to Ms. Harris: the primary guideline was USSG § 2A6.1 (Threatening or Harassing Communications), with a final offense level of 14, and a criminal history category of I. Two defendants received probationary sentences. Of the thirteen remaining defendants, 53% received a downward departure or variance and 33% received a within guidelines range sentence:



The average length of imprisonment for those thirteen defendants was twelve months, while the median length of imprisonment was ten months:



**Note:** The figure includes the 13 defendants reported to the Commission (1) whose primary guideline was §2A6.1, with a Final Offense Level of 14 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) the defendant received a sentence of imprisonment in whole or in part. Cases missing information necessary to complete the analysis were excluded from this figure.

To avoid unwarranted sentencing disparities, Ms. Harris requests this Court impose a sentence of 12 months.

### C. Ms. Harris's Mental Conditions and Diminished Capacity

Section 5H1.3 of the Sentencing Guidelines states that mental and emotional conditions may be relevant in determining whether a departure is warranted, "if such conditions, individually, or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Similarly, § 5K2.13 states that a downward departure may be warranted if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."

Ms. Harris's mental conditions are relevant, present to an unusual degree, distinguish her case from the typical case, and her significantly reduced mental capacity contributed substantially to her decision to make the phone calls and voicemails in this case, and affected the pattern and substance of those calls.

While Dr. Cunliffe may disagree with the specific diagnoses of the various mental health professionals who have evaluated Ms. Harris over the course of this case, all of those mental health professionals, including Dr. Cunliffe, agree that Ms. Harris suffers from serious, long-standing mental health issues that affect how she perceives herself, other people, and the world around her. Dr. Cunliffe will address Ms. Harris's specific mental health issues at the sentencing hearing. A report of his

7

observations, findings, and recommendations will be provided to the Government and the Court in a sealed filing in advance of the sentencing hearing.

## III.   Conclusion

Decades of untreated delusions and depression culminated in months of repetitive, manic, and admittedly scary phone calls to the victims in this case. To be clear, Ms. Harris's mental health issues do not excuse her conduct—they contextualize it and they mitigate it. Many of her statements to the victims were vile and caused great emotional pain. It would be easy for the Court, however, to label Ms. Harris a virulent anti-Semite and stop there. But § 3553(a) and the Sentencing Guidelines require the Court to weigh Ms. Harris's offense conduct on the one hand against her personal characteristics and history on the other. For most of Ms. Harris's life she has been law abiding. She has one criminal history point from a 2014 misdemeanor. She pleaded guilty in this case to accept responsibility and avoid the traumatic effects of a trial on the victims and their families. And importantly, there is no evidence that Ms. Harris intended to carry out any of the threats in this case.

Ultimately, this case is about a troubled, mentally-ill individual who has gone 59 years without any meaningful mental health care. A sentence of twelve months reflects the seriousness of Ms. Harris's criminal conduct while also acknowledging the insidious nature of untreated mental diseases.

WHEREFORE, for the reasons set forth above and as will be further detailed at the time of sentencing, Ms. Harris respectfully requests that the Court sustain her objections to the draft PSI and impose a sentence of 12 months imprisonment.

Respectfully Submitted,

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

*s/ Andrew S. Jacobs*
Andrew S. Jacobs
Assistant Federal Public Defender
Florida Special Bar No. A5502687
150 W. Flagler St., Ste. 1700
Miami, FL 33130
305-533-4201
Andrew_Jacobs@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on May 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     */s/ Andrew S. Jacobs*
        Andrew S. Jacobs

9